John DILLARD, et al., Plaintiffs,

v.

BALDWIN COUNTY COMMISSION, Defendant.

Civ. A. No. 87–T–1159–N.

United States District Court, M.D. Alabama, N.D.

June 6, 1988.

James U. Blacksher, Mobile, Ala., Larry Menefee, Edward Still, Reeves & Still, Birmingham, Ala., Julius L. Chambers, Lani Guinier, Pamela Karlan, NAACP Legal Defense Fund, New York City, Allan R. Chason, Chason & Chason, Bay Minette, Ala., for plaintiffs.

Don Siegelman, Alabama Atty. Gen., Susan Russ, Asst. Atty. Gen., David Boyd, Balch & Bingham, Montgomery, Ala., Taylor D. Wilkins, Jr., Claude E. Bankester, Wilkins, Bankester & Biles, P.A., Bay Minette, Ala., for defendant.

## MEMORANDUM OPINION

MYRON H. THOMPSON, District Judge.

The plaintiffs have brought this lawsuit on behalf of all black citizens in Baldwin County, Alabama.[1] They charge that the at-large system used to elect the Baldwin County Commission violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973.[2] A violation of § 2 is established if official action was taken or maintained with a racially discriminatory "intent" or the action has racially discriminatory "results," determined according to certain Congressionally approved criteria. *McMillan v. Escambia County*, 748 F.2d 1037, 1046 (5th Cir.1984) (Former Fifth); *Buskey v. Oliver*, 565 F.Supp. 1473, 1481 & n. 18 (M.D.Ala.1983).

The Baldwin County Commission has conceded that its at-large election system violates § 2, and thus the only issue before the court is what measures are necessary to remedy the violation. The special master in this case, United States Magistrate John L. Carroll, has recommended that the court adopt the plaintiffs' proposed plan of seven single-member districts, rather than the county commission's proposed plan of a "pure" at-large system. For reasons that follow, the court concludes that the magistrate's recommendation should be adopted.

## I.

Baldwin County is located in southwest Alabama. According to the 1980 census, there are 78,556 people in the county of whom 12,047, or 15.34%, are black, and 65,840, or 83.81%, are white.[3] Most of the black population is concentrated in neighborhoods on a strip along the county's western border.

Baldwin County is currently governed by a board of four commissioners. The system used to elect the commission has three structural features particularly relevant here. First, a candidate for commissioner must run at-large, or countywide, with all voters in the county allowed to vote for the candidate. Second a candidate must run for a "numbered post" or separate place. Each commissioner position carries a separate number, and each candidate qualifies

---

1. This lawsuit is one among many *Dillard* cases, now pending in this court, challenging the at-large election systems and various features of those systems used by many cities, counties, county school boards across Alabama. The plaintiffs in these *Dillard* cases have charged that these at-large systems violate § 2.

In *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988), this court traced, in some detail, the evolution of these *Dillard* cases. This lawsuit against the Baldwin County Commission is one of the "Group B" cases discussed there.

2. Section 2, as amended, reads as follows:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

(b) A violation of subsection (a) is established if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C.A. § 1973.

3. The remaining population of 669 consists of those who are neither black nor white. In a companion case involving the Baldwin County school board, *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala.1988), this court incorrectly lumped the 669 in with the black population. The inclusion of this group with the black population was a minor inaccuracy and in no manner affected the findings of the court in the school board case.

for a specific number and place, with each voter allowed to vote for only one candidate in each place.[4] And third, a candidate must receive a majority of votes cast in the primary to win the nomination of a political party. If no candidate receives a majority of votes, a run-off primary election is held. The majority-vote requirement does not apply to general elections.

The Baldwin County Commission has proposed a "pure" at-large election system to cure the § 2 violation in its current system. Under the commission's plan, elections would continue to be at-large, but the numbered-place and majority-vote components would be abandoned. The size of the commission would be increased to five.

The plaintiffs contend that the county commission's plan does not remedy the § 2 violation, and, indeed, violates § 2. They have proposed a remedy of their own, of seven single-member districts, one of which would have a substantial majority of black voters.

## II.

Congress has made clear that in determining a remedy for a § 2 violation, a

court should exercise its traditional equitable powers to fashion the relief so that it *completely* remedies the prior dilution of minority voting strength and *fully* provides equal opportunity for minority citizens to participate and to elect candidates of their choice.

S.Rep. No. 417, 97th Cong.2nd Sess. 31, *reprinted in* 1982 U.S.Code Cong. & Ad. News, 177, 208 (emphasis added). Thus, in the appeal of another *Dillard* case, the Eleventh Circuit Court of Appeals instructed that this court could not adopt any remedy that itself violates § 2, or that does not itself "completely" and "with certitude" remedy the § 2 violation. *Dillard v. Crenshaw County*, 831 F.2d 246, 249, 252 (11th

Cir.1987). However, in exercising this broad equitable authority, a court must, whenever practicable, afford the jurisdiction an opportunity to remedy the violation first, *Wise v. Liscomb*, 437 U.S. 535, 540, 98 S.Ct. 2493, 2497, 57 L.Ed.2d 411 (1978), with deference accorded the jurisdiction's plan if it provides a full, legally acceptable remedy. *Tallahassee Branch of NAACP v. Leon County*, 827 F.2d 1436, 1438–40 (11th Cir.1987). But if the jurisdiction fails to remedy completely the violation or if its proposed remedial plan itself violates § 2, the court must itself take measures to remedy the violation, but any court remedy must be narrowly tailored to include only those measures necessary to cure the defect. *Upham v. Seamon*, 456 U.S. 37, 42–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982) (per curiam).

Because the nature and scope of a required remedy depends on the nature and scope of the violation, the first issue for the court is, What exactly is the § 2 violation here? Although the Baldwin County Commission conceded liability, it did not reach an agreement with plaintiffs as to how its present election system violates § 2. Fortunately, the at-large system used by the commission is the same as the one used by the county school board, and this court recently addressed in some detail in another, companion case involving the school board, just how the system violates § 2.[5] *Dillard v. Baldwin County Board of Education*, 686 F.Supp. 1459 (M.D.Ala. 1988).[6]

Much abridged, the holdings and findings of the court in the school board case were as follows. First, the court held that the at-large scheme was a product of "intentional" racial discrimination. The evidence reflected that, for the purpose of minimizing black voting strength, the Alabama legislature reshaped local at-large election

---

**4.** The county also has a district residency requirement. Although the candidates run at-large, the county is divided into four districts, with each position corresponding to a district. To qualify for a particular position, a candidate must live in the district that corresponds with the position.

**5.** In addressing the recommendation of the magistrate, both the plaintiffs and the county commission have, without objection, pointed to and relied on the opinion of the court in the school board case.

**6.** The opinion in the school board case was issued on April 8, 1988.

schemes by enacting "anti-single shot" laws in the 1950's and by replacing those laws in 1961 with "numbered place" laws. The evidence also established that the legislature engaged in a century-long pattern and practice of switching between local at-large election systems and local single-member district systems as needed to diminish black voting strength. *Baldwin County Board of Education,* 686 F.Supp. at 1467–69; *see also Dillard v. Crenshaw County,* 640 F.Supp. 1347 (M.D.Ala.1986). The court went on to conclude that the at-large system used by the school board was a product of both invidious schemes and that the at-large system was still having its intended racist effect. *Baldwin County Board of Education,* 686 F.Supp. at 1468.

Second, the court held that § 2 was violated because, as a "result" of the county's at-large system, black voters in Baldwin County do not have an opportunity equal to that of whites to participate in the political process and to elect candidates of their choice. This holding was based on two significant findings. First, the court found extensive "racially polarized voting" in the county: that is, that black citizens in the county constitute a politically cohesive unit, but that the white majority usually votes as a block to defeat the preferred candidate of the black voters. Because of this polarization, it is difficult, if not impossible, for black electors to elect candidates of their choice. *Baldwin County Board of Education,* 686 F.Supp. at 1464–67. Second, the court found that this difficulty is for the most part attributable to the at-large election system used by the county, or, to put it another way, that black electors would have the potential to elect representatives in the absence of the system. The plaintiffs demonstrated that a system of seven single-member districts would allow them to elect a candidate of their choice, even with a majority-vote requirement and even in the context of intensively racially polarized voting. The evidence reflected that, if the county were divided into at least seven districts, the county's black citizens are sufficiently large and geographically compact to constitute a substantial voting-age majority in one of these districts.[7] *Id.* This second finding of the court was also premised on evidence that, by 1990, the county population will have increased to 98,820, with the white population having increased by 19,280 to 85,120 or 86.14% of the population, but with black population having increased by less than a

7. The court found that the following conditions also existed in Baldwin County:

*First,* ... from the late 1880's to the present the State of Alabama and its political subdivisions have "openly and unabashedly" discriminated against their black citizens by employing at different times such devices as the poll tax, racial gerrymandering, and at-large elections, and by enacting such laws as the anti-single-shot voting laws, numbered places laws, and the Sayre law..... Without question, the present depressed levels of black voter participation in Baldwin County may be traced to these historical devices and laws.

*Second,* [there is] historic discrimination in all areas of the economic and social life of Alabama blacks, including in education, employment, and health services. The evidence now before the court reflects that this discrimination has resulted in a lower socio-economic status for Alabama blacks as a group than for whites, and that this lower status has not only given rise to special group interests for blacks, it has depressed levels of black voter participation and has thereby hindered the ability of blacks to participate effectively in the political process and to elect represent-atives of their choice to the Baldwin County Board of Education.

*Third,* Baldwin County has a majority-vote requirement for primary elections for its county school board. There is also a numbered post requirement for the board. The evidence reflects that these two requirements in conjunction with the at-large election requirement have served as a substantial—indeed, the court is convince insurmountable—political barrier to the ability of the county's black voting minority to elect candidates to the school board.

*Fourth,* the Baldwin County Board of Education has been particularly unresponsive to the black citizens' concern about race relations in the county's schools, in particular concerns arising out of school desegregation and the apparent resulting displacement of black administrators.

*Fifth and finally,* the Baldwin County Board of Education has not articulated, or offered evidence of, any policy underlying its past and intended continued use of at-large elections.

*Baldwin County Board of Education,* 686 F.Supp. at 1466–67 (citation omitted).

thousand and with a percentage point decrease from 15.34% to less than 14%.

Based on these findings and others, the court concluded that

the Baldwin County Board of Education's at-large election system, including in particular its majority-vote and numbered-post features, has interacted with the extensive racial polarization in the county to render the ability of the black voters to elect their representative substantially inferior to that of whites. Indeed, the court is convinced that the black citizens of Baldwin County have been effectively left unrepresented because the school board representatives in the county may for the most part ignore the interests of blacks in the county without fear of political consequences. The court is also convinced that this dilution of the black vote—or more appropriately annihilation of it—is not only exacerbated by the depressed social and economic conditions for most blacks in the county, it is perpetuating these conditions. Moreover, and perhaps most sadly, because these depressed conditions are due to this state's long and immoral history of treating its own black citizens as second class, this dilution of the black vote is also effectively perpetuating this discrimination, such that each black child born in Baldwin County is automatically a new victim to this history.

*Id.* at 1467.

Shortly after the court issued its memorandum opinion in the school board case,

the board agreed to forgo an appeal and accept the seven single-member districting system, with some minor line changes agreed to by plaintiffs.[8]

## III.

■ The county commission contends, as stated, that its proposed "pure" at-large system cures any § 2 violation in its present system. It is, however, apparent from the evidence now before the court that the commission's proposed plan not only fails to provide an adequate cure, the plan violates § 2 itself.

## A.

First of all, the commission's plan violates § 2's results test. As this court explained in some detail in the school board case, the Supreme Court recently set forth in *Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986), the manner in which a trial court should assess a § 2 results claim. The claim is established where the "totality of the circumstances," 42 U.S.C.A. § 1973(b), reveals that "as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice." *Id.* at 44, 106 S.Ct. at 2763, *quoting* S.Rep. No. 417, 97th Cong. 2nd Sess. 28, *reprinted in* 1982 U.S.Code Cong. & Ad.News, 177, 206.

The *Thornburg* Court went on to list nine Congressional factors typically considered in evaluating a results claim.[9] The

---

**8.** The election system, as modified, is subject to approval of the court after a fairness hearing for the plaintiff class, scheduled for June 17, 1988. *See* Fed.R.Civ.P. 23(e).

**9.** These factors are: (1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting in the elections of the state or political subdivision is racially polarized; (3) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; (4) if there is a candidate slat-

ing process, whether the members of the minority group have been denied access to that process; (5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; (7) the extent to which members of the minority group have been elected to public office in the jurisdiction; (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; (9) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or stan-

Court observed that the compilation of these factors is premised on the notion "that a certain electoral law, practice or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representative." *Id.* at 47, 106 S.Ct. at 2764–65.

The Court further observed that there is one significant limit on a results claim. A minority group has no right under § 2 to proportional representation; "the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.* at 46, 106 S.Ct. at 2764. Rather, as stated, the plaintiffs must show that, under the totality of circumstances, the challenged electoral scheme results in an unequal access to the electoral process.

The *Thornburg* Court then refined the above general observations to address the specific type of governmental decision being challenged: the decision of a government to employ, in the face of a majority-vote requirement, at-large districting rather than single-member districts with one or more majority black districts. *Id.* at 45, 106 S.Ct. at 2764. The Court held that while all nine of the Congressional factors typically considered remain relevant, two circumstances are more important, and indeed are essential, to success on this challenge. *Id.* at 48–50 & ns. 15 & 16, 106 S.Ct. at 2765–67 & ns. 15 & 16.

The Court required, as a first "precondition" to such a challenge, that the minority must be able to show that it experiences substantial difficulty electing representatives of its choice. To do this it must show the existence of "racially polarized voting": that is, that the minority group constitutes a politically cohesive unit and that the white majority votes sufficiently as a block, usually to defeat the minority's preferred candidate. *Id.* at 52, 54, 106 S.Ct. at 2767, 2769. If the minority group is not politically cohesive, it cannot be said that distinctive minority group interests are being thwarted, *id.;* and without significant white bloc voting, usually to defeat minori-

ty preferences, it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters. *Id.* at 48 n. 15, 106 S.Ct. at 2766 n. 15. Indeed, for these reasons, racially polarized voting is viewed as the key element of a vote dilution claim. *Id.* at 30, 106 S.Ct. at 2769.

It cannot also be overlooked that racially polarized voting not only deprives minority voters of their preferred representatives, it also leaves them effectively unrepresented because it allows those elected to ignore minority interest without fear of political consequences. *Id.* at 48 n. 14, 106 S.Ct. at 2765 n. 14. In a very real sense, therefore, racially polarized voting perpetuates the effects of past discrimination. *Id.* at 44 n. 9, 106 S.Ct. at 2763 n. 9.

The Court required, as a second precondition, that the minority be able to demonstrate that its difficulty in electing candidates of its choice is in some measure attributable to the challenged election feature, *id.* at 48, 106 S.Ct. at 2765, or, to put it another way, that the minority has the *potential* to elect representatives in the absence of the challenged feature. *Id.* at 50–51 & n. 17, 106 S.Ct. at 2766–67 & n. 17. Because the questioned choice in *Thornburg* was in the context of a majority vote requirement and because it was between an at-large system and a scheme with a majority-black single-member district, the Court logically required that "the minority group ... be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. at 2766. As the Court explained, "If it is not, as would be the case in a substantially integrated district, the *multi-member form* of the district cannot be responsible for minority voters' inability to elect its candidates." *Id.* (emphasis in original) (footnotes omitted). In effect, therefore, under *Thornburg* if a minority seeks to require that a jurisdiction with a majority-vote requirement adopt single-member districts with one or more majority-black districts, the minority must be able to show in

---

dard, practice or procedure is tenuous. *Thorn-* *burg,* at 36–37, 106 S.Ct. at 2759–60.

the *liability* phase of its case that the remedy of a majority-black single-member district is in actuality possible.

The plaintiffs here have met the second *Thornburg* precondition, that they be sufficiently large and geographically compact to constitute a majority in a single-member district. They have submitted the same plan approved by this court in the school board case: a districting plan with seven single-member districts, one of which, district one, has a black voting-age majority.[10]

The critical question therefore is whether the first *Thornburg* precondition is met, that is, whether black voters in Baldwin County will continue to experience, under the commission's proposed plan, substantial difficulty electing representatives of their choice. As this court found in the school board case, there is extensive racial polarization in the county. Black voters constitute a politically cohesive unit in the county, and white voters vote as a block to defeat the black voters' preferred candidate. The answer to this critical question therefore turns on whether the commission's plan offers black voters in the county a substantial potential to elect representatives of their choice, *even in the face of such polarized voting.*

The commission's principal contention in support of its plan is that black voters will be able to elect their preferred candidate through the use of "single-shot voting." The evidence refutes this contention, however. The United States Supreme Court explained single-shot voting as follows:

> Consider [a] town of 600 whites and 400 blacks with an at-large election to choose four council members. Each voter is able to cast four votes. Suppose there are eight white candidates, with the votes of the whites split among them approximately equally, and one black candidate, with all the blacks voting for him and no one else. The result is that

each white candidate receives about 300 votes and the black candidate receives 400 votes. The black has probably won a seat. This technique is called single-shot voting.

*City of Rome v. United States,* 446 U.S. 156, 184 n. 19, 100 S.Ct. 1548, 1565 n. 19, 64 L.Ed.2d 119 (1980), *quoting U.S. Commission on Civil Rights,* "The Voting Right Act: Ten Years After," pp. 206–07 (1975). The county commission fails to appreciate that single-shot voting can be an effective tool only if the group utilizing it constitutes a substantial percentage of those voting. The court has not attempted to calculate the exact cut-off point where single-shot voting would not be effective, but suffice it to say that a figure between 13 and 14%, the estimated 1990 percentage of black citizens in Baldwin County, falls far below this point, as the court will demonstrate.[11]

If the *City of Rome*'s numerical framework of 1000 voters is used, a community that is 14% black would have 140 black voters and 860 white voters. With five commissioner positions available and with each voter thus able to cast five votes for separate candidates, as is the case with the commission's proposed plan, the 1000 voters would be able to cast a total of 5000 votes; the white voters would have a total of 4,300 votes and the black voters would have a total of 700 votes. But if the black electors choose to single-shot their votes, they would have only 140 votes. The black voters would be able, with 140 votes, to elect someone *only if* there were 31 or more other candidates *and* the white voters split their votes evenly among all 31 candidates.[12] No one can seriously question that the concurrence of both these conditions in Baldwin County is not only unlikely on a regular basis, it is unlikely to happen ever. Under the commission's plan, therefore, white voters would be able to continue to vote, as they have done in the past, to

---

10. A copy of the plaintiffs' plan is attached.

11. As stated in Part II of this memorandum opinion, the evidence reflects that, by 1990, the percentage of black citizens in Baldwin will decrease from the 1980 census figure of 15.54% to less than 14%.

12. The court arrived at 31 by dividing 4,300 by 140. Both the commission and the plaintiffs agree with the method of analysis used as well as with the figures derived from it.

defeat the black voters' preferred candidate. The commission's plan does not provide black voters in the county with an equal opportunity to participate in the political processes and to elect candidates of their choice.[13]

### B.

Moreover, the county commission's plan is still a product of the legislature's intentional racial discrimination. The commission incorrectly assumes that by deleting the numbered-place feature in its at-large system, it also completely removes any racially discriminatory taint. To be sure, this court specifically found in the school board's case that the Alabama legislature adopted numbered-place laws with the intent of discriminating against black voters. *Baldwin County Board of Education,* 686 F.Supp. at 1468. The commission overlooks, however, that the legislature did this to "reshape[ ] *at-large systems* into *more* secure mechanisms for discrimination." *Id., quoting from Dillard v. Crenshaw County,* 640 F.Supp. at 1357 (emphasis added). Thus, the state legislature intentionally used not just numbered-place laws, but at-large systems themselves to discriminate; the tool of discrimination was the at-large system itself. Removing one feature, by itself, does not necessarily remove the taint.

Furthermore, the court found that the county's at-large election system was a product of a century-long legislative scheme of switching between local at-large systems and local single-member district systems as needed to diminish black voting strength. The commission has not explained how deleting just one feature of an at-large system would also delete the invidious taint of this broad legislative scheme.

### IV.

In contrast to the county commission's plan, the plan proposed by the plaintiffs does not violate § 2 and it fully remedies the § 2 violation. It provides for a district, district one, with an expected 1990 black population of over 63% of the total district population. The evidence reflects that, when all political, socio-economic and historical characteristics are considered, this district will also have a clear majority-black voting-age population, capable of electing a representative of its own choice.[14]

The county commission does, however, challenge whether the plaintiffs' plan meets the *Thornburg* requirement of "sufficient compactness." The court rejects this challenge for the same reasons it rejected a similar challenge in the school board case. *Baldwin County Board of Education,* 686 F.Supp. at 1465–66.

The county commission also objects to the increase in the number of commissioners, from four to seven, in the plaintiffs' plan. It is clear that, to create a majority-black voting-age district in the county, the size of the commission must be increased to seven. Thus, an increase is essential to vindicating the § 2 rights of the county's black citizens. On the other hand, the commission has failed to articulate, and the evidence does not support, any substantial and compelling interest the commission has in limiting the size of the commission to four, or even five as embodied in its proposed plan. Absent such interest, the strong Congressional command of § 2—that the political porcess be open to blacks and whites equally—directs that the court accede to the plaintiffs' request that the size of the commission be increased to seven. *See e.g., Dillard v. Crenshaw County,* 649 F.Supp. 289 (M.D.Ala.1986) (size of commission increased), *affirmed in part and remanded in part for reconsid-*

---

**13.** The actual scenario for Baldwin County would be a lot worse than the one used by the court. Although the county's expected 1990–black population is less than 14%, its expected black voting-age population would be even smaller. A larger percentage of blacks than whites are under 18 and thus not of voting age. Moreover, the percentage of black eligible vot-

ers who vote is smaller than that for white eligible voters, due to long-standing adverse socio-economic conditions for blacks in the county.

**14.** The plaintiffs' plan also meets one-person one-vote requirements.

*eration*, 831 F.2d 246 (11th Cir.1987), *reaffirmed on remand*, 679 F.Supp. 1546 (M.D.Ala.1988); *cf. Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1563 (11th Cir.1987) (trial court erred in not allowing plaintiffs to proffer "evidence relating to the geographic concentration of voters by race in proposed three member and five member form of commission government in Carroll County, [Georgia].")

The commission also complains that the plaintiffs' plan splits cities and other communities. Preserving municipal and other community or political boundaries cannot outweigh the requirement placed on this court to approve or fashion only that remedy which fully cures the § 2 violation. *See, e.g., Mirrione v. Anderson*, 717 F.2d 743, 744–45 (2d Cir.1983), *cert. denied*, 465 U.S. 1036, 104 S.Ct. 1308, 79 L.Ed.2d 706 (1984) (interest in avoiding diminution of black voting strength outweighed problems caused by splitting Rosedale, New York, four ways); *cf. Reynolds v. Sims*, 377 U.S. 533, 579–81, 84 S.Ct. 1362, 1390–91, 12 L.Ed.2d 506 (1964) (preserving integrity of political boundaries cannot outweigh right to vote). The commission has failed to submit a plan that mets this requirement while at the same time fully preserving all political boundaries.

Finally, the county commission proffers a number of arguments against single-member districting in general. The commission argues, for example, that single-member districts prevent "coalition building" among the two races and, indeed, foster racial polarization in voting, and that such districting does not help those black citizens who live outside majority-black single-member districts. These arguments and others were rejected by Congress when it amended § 2 in 1982. As the three-judge court in *Gingles v. Edmisten*, 590 F.Supp. 345, 356–57 (E.D.N.C.1984), *affirmed in part and reversed in part on other grounds sub nom. Thornburg, supra*, stated,

> In enacting amended Section 2, Congress made a deliberate political judgment that the time had come to apply the statute's remedial measures to *present conditions* of racial vote dilution that might be established in particular litigation.....

> \* \* \* \* \* \*

> In making that political judgment, Congress necessarily took into account and rejected as unfounded, or assumed as outweighed ... the risk that creating "safe" black-majority single-member districts would perpetuate racial ghettos and racial polarization in voting behavior; the risk that reliance upon the judicial remedy would supplant the normal, more healthy processes of acquiring political power by registration, voting and coalition building; and the fundamental risk that the recognition of "group voting rights" and the imposing of affirmative obligation upon government to secure those rights by race-conscious electoral mechanisms was alien to the American political tradition.

(emphasis in original) (footnotes omitted). In any event, significant coalition building between the races has not been characteristic of politics in Baldwin County in the past, and there is no credible evidence that circumstances will be different in the immediate future.

## V.

In conclusion, the court holds that the pure at-large system proposed by the county commission fails to cure the § 2 violation and itself violates § 2. For this court to adopt and implement the commission's plan, "it would condemn the black citizens of Baldwin County to continued second class citizenship, but this time with the imprimatur of a federal court." *Baldwin County Board of Education*, 686 F.Supp. at 1470. In contrast, the plaintiffs' plan, which has seven single-member districts, fully remedies the § 2 violation, does not itself violate § 2, and meets all one-person one-vote requirements. The court will therefore require that the county commission implement the plaintiffs' plan in time for the upcoming 1988 elections.

An appropriate judgment and injunction will be entered.

### JUDGMENT AND INJUNCTION

In accordance with the memorandum opinion entered this date, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That defendant Baldwin County Commission's objections to the recommendation of the magistrate be and they are hereby overruled, and that the recommendation of the magistrate be and it is hereby adopted;

(2) That judgment be and it is hereby entered in favor of the plaintiffs and against defendant Baldwin County Commission;

(3) That it be and is hereby DECLARED that the current at-large system used to elect the members of defendant Baldwin County Commission violates § 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973;

(4) That it be and is hereby DECLARED that the proposed 'pure' at-large election plan submitted by defendant Baldwin County Commission is unacceptable under § 2 of the Voting Rights Act;

(5) That it be and is hereby DECLARED that the single-member redistricting plan, consisting of seven members, submitted by the plaintiffs is acceptable under § 2 of the Voting Rights Act; and

(6) That defendant Baldwin County Commission, its officers, agents, servants, and employees, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and each is hereby RESTRAINED and ENJOINED:

(A) From using its current at-large election system in any future elections;

(B) From failing to implement the single-member redistricting plan, consisting of seven members, submitted by the plaintiffs; and

(C) From failing to conduct elections for all members of the defendant Baldwin County Commission under the plaintiffs' redistricting plan by January 1, 1989.

It is further ORDERED that the plaintiffs have and recover from defendant Baldwin County Commission their reasonable attorney fees, and that the plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their request for attorney fees.

It is further ORDERED that costs be and they are hereby taxed against defendant Baldwin County Commission, for which execution may issue, and that plaintiffs be and they are hereby allowed until the completion of all the *Dillard* cases to file their bill of costs.

The clerk of the court is DIRECTED to issue a writ of injunction.

APPENDIX A

PLAINTIFFS'
PLAN