John DILLARD, Plaintiff-Appellee,

Dale Eugene Brown, George R. Johnson, et al., Intervenors-Plaintiffs-Appellants,

v.

BALDWIN COUNTY COMMISSIONERS, Defendant-Appellee.

No. 99-12251.

United States Court of Appeals,

Eleventh Circuit.

Sept. 8, 2000.

Appeal from the United States District Court for the Middle District of Alabama.(No. 87-01159-CV-T-N), Myron H. Thompson, Judge.

Before CARNES, BARKETT and MARCUS, Circuit Judges.

MARCUS, Circuit Judge:

Intervenors Dale Eugene Brown, George R. Johnson, James Austin, Jr., and Alvin Lee Pitts (the "Intervenors") appeal the district court's order granting the original Plaintiffs' (the "Dillard Plaintiffs") motion to dismiss the Intervenors' complaint. The Intervenors sought to intervene as plaintiffs in order to challenge the district court's 1988 remedial order which changed the size of the Baldwin County Commission from four commissioners to seven in order to remedy a violation of section 2 of the Voting Rights Act. The district court dismissed the Intervenors' complaint, holding that while the Intervenors had standing to bring their complaint, they failed to state a claim upon which relief can be granted. Because we conclude that the district court correctly found that the Intervenors had standing to bring their claims, but incorrectly held that they failed to state a claim, we reverse the district court's order and remand for further proceedings consistent with this opinion.[1]

I.

_____

[1]On August 4, 2000, we decided the companion case to this one, *Wilson v. Minor,* 220 F.3d 1297 (11th Cir.2000). In *Wilson* we held that the 1988 injunction ordered by this Court to remedy a section 2 violation of the Voting Rights Act changed the size of the Dallas County Commission and was, therefore, impermissible under controlling Supreme Court precedent.

This case has had a long and protracted history. In 1986, John Dillard and other African American voters brought suit against the Baldwin County Commission alleging that the at-large system used to elect its members violated section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1973. At the time of this challenge, the Baldwin County Commission was composed of four persons elected at-large, one from each of four numbered districts. The case was one among many Dillard suits in the district courts which challenged the at-large election systems used by dozens of cities, counties, and school boards across Alabama. *See Dillard v. Baldwin County Bd. of Educ.,* 686 F.Supp. 1459 (M.D.Ala.1988) (setting forth the history and evolution of the Dillard cases).

The Baldwin County Commission conceded liability and the district court ordered relief. To remedy the violation, the district court ordered the Commission to increase its membership from four to seven persons elected from single-member districts in order to ensure a majority-black voting district. The court noted that only 15.34% of the County's population was black and the number was expected to decrease after the 1990 census. *Dillard v. Baldwin County Comm'n,* 694 F.Supp. 836, 839-40 (M.D.Ala.1988),*amended by,* 701 F.Supp. 808 (M.D.Ala.1988), *aff'd,* 862 F.2d 878 (11th Cir.1988) (table). Therefore, the court concluded, "to create a majority-black voting-age district in the county, the size of the commission must be increased to seven." *Id.* at 843. The court's remedy created a district with a black population expected to be over 63% in 1990.

In October 1996, the Intervenors moved to intervene in the case as plaintiffs and sought to have the 1988 remedial order vacated in light of the Supreme Court's decision in *Holder v. Hall,* 512 U.S. 874, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994), and this Circuit's holdings in *White v. Alabama,* 74 F.3d 1058 (11th Cir.1996), and *Nipper v. Smith,* 39 F.3d 1494 (11th Cir.1994) (*en banc* ), *cert. denied,* 514 U.S. 1083, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995). In their complaint, the Intervenors alleged that by increasing the size of the Commission from four to seven members in order to create a majority black district, the district court "exceede[d] its authority granted by Congress in the Voting Rights Act, and violate[d] the Tenth and Eleventh Amendments...." Complaint at 7. The Intervenors asked the court to enter an order modifying the injunction

and providing for the establishment of a districting plan composed of four single-member districts with the probate judge acting as chair of the Commission. The Intervenors did not seek a return to at-large election of the commissioners.

Neither party opposed the Intervenors' motion, but both reserved the right to challenge the legal sufficiency of the Intervenors' complaint. The district court granted the Intervenors' motion to intervene subject to the parties' reservations.

In December 1996, the Dillard Plaintiffs moved to dismiss the complaint-in-intervention arguing that the Intervenors lacked standing to challenge the 1988 Order and that the complaint failed to state a claim upon which relief can be granted. On June 18, 1999, the district court granted the Dillard Plaintiffs' motion to dismiss. The district court held that the Intervenors had standing to challenge the 1988 injunction "insofar as they claim that the defendants' implementation of the court's remedial order violates their rights." Order at 6. However, the court concluded, the Intervenors failed to state a claim upon which relief can be granted. According to the district court, the Intervenors failed to state a claim under the Tenth and Eleventh Amendments because the rights deprivation they alleged was the result of state rather than federal authority, and they failed to state a claim under section 2 of the Voting Rights Act because they did not allege that the 1988 injunction resulted in vote discrimination on account of race. The court also concluded that Fed.R.Civ.P. 60 did not provide a proper vehicle for the Intervenors to seek relief from the injunction.

II.

We review the district court's order of dismissal *de novo* and will uphold a dismissal only if it appears beyond doubt that the allegations in the complaint, when viewed in the light most favorable to the plaintiff, do not state a claim upon which relief can be granted. *See Southeast Florida Cable, Inc. v. Martin County, Fla.,* 173 F.3d 1332, 1335 n. 5 (11th Cir.1999). Standing is a jurisdictional issue which is also reviewed *de novo. See Engineering Contractors Assn. of South Florida Inc. v. Metropolitan Dade County,* 122 F.3d 895, 903 (11th Cir.1997), *cert. denied,* 523 U.S. 1004, 118 S.Ct. 1186, 140 L.Ed.2d 317 (1998).

A.

Indeed, standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims. *See Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 1016, 140 L.Ed.2d 210 (1998); *Florida Assoc. of Med. Equip. Dealers v. Apfel,* 194 F.3d 1227, 1230 (11th Cir.1999); *EF Hutton & Co., Inc. v. Hadley,* 901 F.2d 979, 983 (11th Cir.1990). We are obliged to consider standing *sua sponte* even if the parties have not raised the issue. *See United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 2435, 132 L.Ed.2d 635 (1995); *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 410 (11th Cir.1999). In this case, the Appellees[2] have argued that the Intervenors lack standing to pursue their claims and that the district court's dismissal of the Intervenors's complaint for failure to state a claim should be affirmed on this alternative ground.

To satisfy the constitutional requirements of standing, a plaintiff must make three showings:

First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992) (internal citations and footnote omitted). *See also Church v. Huntsville,* 30 F.3d 1332, 1335 (11th Cir.1994) (quoting *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982)); *Harris v. Evans,* 20 F.3d 1118, 1121 (11th Cir.1994).

Appellees claim that the district court erred in finding that the Intervenors had Article III standing to challenge the 1988 injunction. Appellees' first argument is particular to Appellants' standing to bring their Tenth Amendment claim. They say that Appellants cannot have standing to assert their Tenth Amendment claim unless they establish standing to bring some other constitutional or statutory claim. Second, and more broadly, Appellees claim that the Intervenors have not alleged a sufficiently concrete and particularized injury

---

[2]Appellees in this case are both the Dillard Plaintiffs and the Baldwin County Commission Defendants.

to establish standing. Finally, Appellees assert that this Circuit's case law, which suggests that the Intervenors have alleged an injury sufficient to establish standing, has been overruled by subsequent Supreme Court rulings. We are not persuaded and address each argument in turn.

First, Appellees argue that private plaintiffs cannot have standing to assert Tenth Amendment claims except in circumstances where they establish some particularized injury which is redressable under some other constitutional or statutory provision. Appellees rely for support on *Seniors Civil Liberties Assn., Inc. v. Kemp,* 965 F.2d 1030 (11th Cir.1992) and *Atlanta Gas Light Co. v. Dep't of Energy,* 666 F.2d 1359 (11th Cir.1982). Neither case supports their contention.

In *Seniors,* the plaintiffs, individual residents of a housing complex for older persons and the Seniors Civil Liberties Association (SCLA), challenged the 1988 amendments to the Fair Housing Act, which prohibited discrimination against families with children. The individual plaintiffs lived in a housing complex that prohibited children under the age of 16 from living in the complex, and the SCLA represented the rights of elderly people to peaceful occupancy of their residences. *See Seniors,* 965 F.2d at 1032. Plaintiffs argued that the familial status antidiscrimination provision of the Fair Housing Act violated their First, Fifth, and Tenth Amendment rights. *Id.* at 1033.

We first addressed the question of plaintiffs' standing to assert their claims, and we held that the individual plaintiffs had standing because "there exists 'a realistic danger of sustaining a direct injury as a result of the [Fair Housing Act's] operation or enforcement.' " *Id.* at 1033 (quoting *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 297, 99 S.Ct. 2301, 2308, 60 L.Ed.2d 895 (1979)). We held that the SCLA also had standing as the representative of its members. *Id.*

In a footnote, we addressed whether the plaintiffs had standing to bring a claim under the Tenth Amendment. We explained that, as with other types of claims, the plaintiffs would have standing to assert a Tenth Amendment claim only if they could show that they suffered a concrete injury resulting from the challenged activity. We observed that "this court has said before that, if injury or threatened injury exists, private parties have standing to assert Tenth Amendment challenges...." *Id.* at 1034 n. 6 (citing *Atlanta Gas,*

666 F.2d at 1368 n. 16). We then reiterated that the plaintiffs had shown an injury sufficient to establish standing to advance their Tenth Amendment claims just as they had established standing to assert their other claims. *Id.*

In *Atlanta Gas,* petitioner gas distribution companies brought a pre-enforcement challenge against various provisions of the Fuel Use Act. The petitioners challenged the constitutionality of the Act under the Commerce clause, the Tenth Amendment and the due process clause of the Fifth Amendment. We held that petitioners had standing to assert both their commerce clause *and* Tenth Amendment claims and considered these claims on the merits. As for their Tenth Amendment claim, we explained that the private petitioners "may make constitutional objections based on any of [the Act's] provisions so long as they show the requisite injury in fact and its causal relation to the action in question." *Atlanta Gas,* 666 F.2d at 1368 n. 16. We concluded "that injury in fact exists or is likely to occur in this case." *Id.*

Appellees nevertheless contend that the private plaintiffs' standing to assert Tenth Amendment claims in *Seniors* and *Atlanta Gas* somehow was contingent on their having standing to assert some other constitutional or statutory claim. There is nothing in either of these cases, however, to support this argument. Indeed, our case precedent makes clear that in order to establish standing to bring a Tenth Amendment claim, just as for any other claim, the plaintiff must show that it suffered an injury in fact caused by the challenged action. Moreover, even if a private plaintiff's standing to assert a Tenth Amendment claim were contingent upon its having standing to assert some other constitutional or statutory claim, the Intervenors would still have standing to assert their Tenth Amendment claim in this case because they have shown standing to assert a claim under section 2 of the Voting Rights Act. *See* discussion *infra* pp. 3830 - 34.

Next, Appellees argue that the Intervenors lack standing to challenge the 1988 injunction because they have not alleged a sufficiently concrete and particularized injury. As Appellees essentially concede, however, our ruling in *Meek v. Metropolitan Dade County, Fla.,* 985 F.2d 1471 (11th Cir.1993), holds otherwise.

In *Meek,* we affirmed the standing of residents to participate in an action challenging the

constitutionality of the election scheme to which they were subject. The plaintiffs, black and Hispanic residents of Dade County, challenged a voting scheme in which the eight County Commissioners were selected from eight districts but each commissioner was elected at-large. The plaintiffs argued that the at-large election scheme violated section 2 of the Voting Rights Act. Two residents of Dade County, who were registered voters, sought to intervene to defend the existing election scheme. The district court denied the intervenors' motions holding that their interests were identical to the defendants' and adequately represented by them. After a bench trial, the district court ruled that the election scheme did violate section 2, and the defendants decided not to appeal the decision. The intervenors filed new motions to intervene in order to pursue the defendants' appeal. The district court denied these motions without explanation.

We reversed, making clear that the intervenors had suffered an injury sufficiently concrete not only to permit them to intervene in the action but also to give them standing to pursue the action on appeal. We explained:

> The intervenors sought to vindicate important personal interests in maintaining the election system that governed their exercise of political power, a democratically established system that the district court's order had altered. As such, they alleged a tangible actual or prospective injury and did not merely challenge unlawful conduct in the abstract. *See generally, e.g., Lujan v. Defenders of Wildlife,* 504 U.S. 555, 574-76, 112 S.Ct. 2130, 2144, 119 L.Ed.2d 351 (1992). Moreover, we reject appellees' contention that the intervenors had only nonjusticiable generalized grievances simply because they asserted interests widely shared by others. *Allen v. Wright,* 468 U.S. 737, 756-60, 104 S.Ct. 3315, 3327-29, 82 L.Ed.2d 556 (1984).

*Meek,* 985 F.2d at 1480; *see also Clark v. Putnam County,* 168 F.3d 458, 461 (11th Cir.1999) (holding that six African American voters were entitled to intervene to defend a court ordered single-member-district voting plan because they had an interest at stake in the action and that interest was not adequately represented by the existing defendants in the action).

Appellees contend that *Meek* and *Clark* do not answer the standing question in this case because the intervenors in both *Meek* and *Clark* came into the action as defendants only seeking to maintain the status quo and were not therefore required to satisfy the higher standing requirements applicable to parties asserting claims for relief. Appellees are correct that we have held that a party seeking to intervene into an already existing justiciable controversy need not satisfy the requirements of standing as long as the parties have

established standing before the court. *See Chiles v. Thornburgh,* 865 F.2d 1197, 1213 (11th Cir.1989) (holding "that a party seeking to intervene need not demonstrate that he has standing in addition to meeting the requirements of Rule 24 as long as there exists a justiciable case and controversy between the parties already in the lawsuit"). But, in *Meek,* we found that the intervenors not only had the right to intervene in the dispute but also that they had standing, because of their interest in "vindicat[ing] important personal interests," *Meek,* 985 F.2d at 1480, to pursue the case themselves on appeal after the original defendants decided not to. "It is well-settled ... that when an intervener appeals and the party on whose side he intervened does not, the intervenor must demonstrate standing in order to continue the suit." *Cox Cable Communications, Inc. v. United States,* 992 F.2d 1178, 1181 (11th Cir.1993) (citing *Diamond v. Charles,* 476 U.S. 54, 68, 106 S.Ct. 1697, 1706, 90 L.Ed.2d 48 (1986)). *See also Arizonans for Official English v. Arizona,* 520 U.S. 43, 65, 117 S.Ct. 1055, 1067, 137 L.Ed.2d 170 (1997) (stating that "[a]n intervenor cannot step into the shoes of the original party unless the intervenor independently 'fulfills the requirements of Article III' ") (quoting *Diamond,* 476 U.S. at 68, 106 S.Ct. at 1706-07).

In *Meek,* therefore, we not only found that the intervenors, as voters subject to the challenged election scheme, satisfied the requirements for intervention under Fed.R.Civ.P. 24, but also, and necessarily, that they independently satisfied the requirements for Article III standing. Moreover, we noted that were we to hold otherwise, "we would be forced to conclude that most of the plaintiffs also lack standing, a conclusion foreclosed by the many cases in which individual voters have been permitted to challenge election practices." *Meek,* 985 F.2d at 1480 (citing *Whitcomb v. Chavis,* 403 U.S. 124, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).

Finally, essentially recognizing that *Meek* controls the standing question in this case, Appellees suggest that *Meek* was wrongly decided in light of subsequent Supreme Court decisions. Appellees rely for support on the Supreme Court's rulings in *Arizonans for Official English,* 520 U.S. 43, 117 S.Ct. 1055, 137 L.Ed.2d 170, *Raines v. Byrd,* 521 U.S. 811, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997), and *United States v. Hays,* 515 U.S. 737, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995). None of these cases, however, furthers

Appellees' cause.

In *Arizonans for Official English* a state employee, Maria-Kelly F. Yniguez, sued the State and its Governor, Attorney General, and Director of the Department of Administration seeking an injunction against enforcement of a state constitutional amendment making English the state's official language. The district court declared the amendment unconstitutional and the state governor decided not to appeal. The state attorney general, as well as Arizonans for Official English Committee (AOE) and its Chairman Robert Park, the amendment's sponsors, sought to intervene in order to defend the amendment on appeal. The district court denied their motions. The Ninth Circuit concluded that AOE and Park had standing to proceed as party appellants, but affirmed the district court's ruling that the amendment was unconstitutional.

The Supreme Court vacated both the court of appeals and district court opinions holding that because Yniguez had resigned from her position with the state while the case was on appeal the case had become moot. In dicta, the Court expressed "grave doubts" about whether AOE and Park had standing under Article III to pursue appellate review of the amendment. *Arizonans for Official English,* 520 U.S. at 66, 117 S.Ct. at 1068. AOE and Park had argued that as the initiative's proponents they had a quasi-legislative interest in defending the constitutionality of the measure they sponsored. The Court noted that while it has "recognized that state legislators have standing to contest a decision holding a state statute unconstitutional if state law authorizes legislators to represent the State's interests[,]" AOE and its members were not elected representatives and the Court was "aware of no Arizona law appointing initiative sponsors as agents of the people of Arizona to defend, in lieu of public officials, the constitutionality of initiatives made law of the State." *Id.* at 65, 117 S.Ct. at 1068. The Court also cast doubt on AOE's assertion of representational or associational standing noting that "[t]he requisite concrete injury to AOE members is not apparent." *Id.* at 66, 117 S.Ct. at 1068.

The question of whether AOE and Park had standing as the sponsors of particular legislation to represent the state's interest in defending that legislation provides no guidance on whether *voters* who live within the governing unit have standing to challenge an allegedly illegal voting scheme to which they are

subject by virtue of their residence. Moreover, as we have noted, the Court in *Arizonans for Official English* did not even resolve the standing issue because of its conclusion that the case was moot. *Id.*

In *Raines,* individual members of Congress brought an action challenging the constitutionality of the Line Item Veto Act. The district court found that the plaintiffs had Article III standing based on their claim that the Act diluted their Article I voting power. The district court then granted the plaintiffs' motion for summary judgment holding that the Act constituted an unconstitutional delegation of legislative power to the President. The Supreme Court took direct appeal of the case as provided for in the Act and vacated the judgment of the district court holding that the plaintiffs did not have standing to bring suit. The Court explained:

> [A]ppellees have alleged no injury to themselves as individuals [ ], the institutional injury they allege is wholly abstract and widely dispersed [ ], and their attempt to litigate this dispute at this time and in this form is contrary to historical experience. We attach some importance to the fact that appellees have not been authorized to represent their respective Houses of Congress in this action, and indeed both Houses actively oppose their suit.

*Raines,* 521 U.S. at 829, 117 S.Ct. at 2322. As with *Arizonans for Official English,* the fact that the Congressmembers in *Raines* did not have standing to challenge the Act because they had not been harmed as individuals, but only as members of an institution which they were not authorized to represent, sheds no light on whether the voters in this case, who are individually subject to and affected by the election scheme they challenge, have standing.

Finally, in *Hays,* the Supreme Court held that the appellees lacked standing to challenge a Louisiana redistricting plan when none of the appellees resided in the district that was the focus of their racial gerrymander claim. *Hays,* 515 U.S. at 739, 115 S.Ct. at 2433. The Court emphasized, however, that voters who lived in the allegedly gerrymandered district would have suffered an injury sufficient to establish standing. According to the Court, "Where a plaintiff resides in a racially gerrymandered district [ ] the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria, and therefore has standing to challenge the legislature's action." *Hays,* 515 U.S. at 744-45, 115 S.Ct. at 2436 (citations omitted). *Hays* set forth a bright-line standing rule for a particular class of cases alleging illegal racial

gerrymandering with respect to voting districts: if the plaintiff lives in the racially gerrymandered district, she has standing; if she does not, she must produce specific evidence of harm other than the fact that the composition of her district might have been different were it not for the gerrymandering of the other district. *Hays* ' narrow holding regarding standing in the gerrymandering context is entirely consistent with our broader holding in *Meek* that respondents had standing to defend the election scheme to which they were subject when that entire election scheme had been challenged as illegal. In both cases, the essential point remains that one who resides in the area directly affected by the allegedly illegal voting scheme has standing to challenge that scheme. *Hays* is in no way inconsistent with our holding in *Meek.*

The case at hand is squarely controlled by this Court's holding in *Meek,* and *Meek* has neither been explicitly overruled nor implicitly undermined by the Supreme Court's decisions in *Arizonans for Official English, Raines,* or *Hays.*[3] As a result, we are bound to follow *Meek* and to conclude, as the district court did, that the Intervenors have standing to assert their claims in this case. *See United States v. Hogan,* 986 F.2d 1364, 1369 (11th Cir.1993) (explaining that "it is the firmly established rule of this Circuit that each succeeding panel is bound by the holding of the first panel to address an issue of law, unless and until that holding is overruled *en banc,* or by the Supreme Court").

B.

We turn now to the merits of the Intervenors' claims. The Intervenors argue that the district court erred in ruling that they failed to state a claim under section 2 of the Voting Rights Act, the Tenth Amendment, or the Eleventh Amendment, and also erred in ruling that they failed to satisfy the requirements for relief under Fed.R.Civ.P. 60(b).

Section 2 of the Voting Rights Act provides: "No voting qualification or prerequisite to voting or

---

[3]Our decision in *Meek* is altogether consonant with the holdings of other circuits granting voters standing to challenge election schemes to which they are subject. *See League of United Latin American Citizens, Council No. 4434 v. Clements,* 999 F.2d 831, 845 (5th Cir.1993) (finding judges who had intervened as defendants had Article III standing as voters affected by the challenged judicial election scheme to pursue the case independently on appeal); *United Jewish Organizations of Williamsburgh, Inc. v. Wilson,* 510 F.2d 512, 520-21 (2d Cir.1975) (holding that white voters had standing as voters to challenge New York's legislative redistricting plan as illegally racially drawn).

standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a). Section 2 continues: "[N]othing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b).

The district court held that the Intervenors failed to state a claim under section 2 because "[t]o make a valid claim under § 2 of the Voting Rights Act ... the plaintiff-interveners would have to allege, at a minimum, that the court's remedial order results in vote-discrimination against them on account of race, color, or membership in a language minority. *See* 42 U.S.C.A. § 1973(a). But the complaint-in-intervention contains no allegation of racial discrimination of any kind." Order at 14-15.

The Intervenors' complaint does, however, allege that the district court intentionally increased the size of the Baldwin County Commission and redrew the district lines specifically in order to create a majority black district. Complaint, ¶ 18. According to the Complaint:

> The Court rejected a remedy proposed by the Commission, which would have eliminated only the numbered place feature of the existing system, and further ordered, over the objection of the Commission, an increase in the size of the Commission. Noting that only 15.34% of the County's population was black, and only 14% of the population expected to be present after the 1990 census, the Court said: "It is clear that, to create a majority-black voting-age district in the county, the size of the commission must be increased to seven. Thus, an increase is essential to vindicating the Sec. 2 rights of the county's black citizens.... [T]he strong Congressional command of Sec. 2—that the political process be open to blacks and whites equally—directs that the court accede to the plaintiffs' request that the size of the commission be increased to seven." [*Dillard v. Baldwin County Comm'n,* 694 F.Supp. 836, 843 (M.D.Ala.1988) ]. By increasing the size of the Commission, the court provided a district with a black population expected to be over 63% in 1990. *Id.*

Complaint, ¶ 18. Moreover, the Complaint alleges that the Intervenors have been hurt by this racially-based increase in the size of the County Commission. *See* Complaint, ¶ 14 (alleging that "Plaintiff-Intervenors ... are residents, citizens, and qualified electors of Baldwin County, Alabama. Each is adversely affected by the increase in the number of members of the Commission").

This Court has made clear in *Nipper* and *White* that a district court may not remedy a section 2 violation by changing the size of a county commission. In *Nipper,* black voters and an association of black

attorneys challenged the system of at-large elections used to elect judges in Florida's Fourth Judicial Circuit Court. The appellants asked the court to remedy the alleged section 2 violation by creating subdistricts to ensure their ability to elect black judges of their choice. *See Nipper,* 39 F.3d at 1496-97. This Court, sitting *en banc,* denied appellants relief on the ground that the relief they sought was improper. We stated clearly that under the Supreme Court's holding in *Holder,* "federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies." *Id.* at 1532; *see also White,* 74 F.3d at 1072 (same). By alleging that they are being subjected to, and their voting power is being affected by, an illegal election scheme that was plainly created because of or on account of race, the Intervenors have adequately stated a claim for a section 2 violation of the Voting Rights Act.

The district court also held, and the Appellees argue on appeal, that the Intervenors failed to state a claim under 42 U.S.C. § 1983 for violations of the Tenth and Eleventh Amendments because the Intervenors are challenging the actions of state actors while the Tenth and Eleventh Amendments only protect against deprivations of rights committed by federal actors.[4] According to the district court: "The interveners allege deprivations of their rights secured by the tenth and eleventh amendments to the United States Constitution, but none of the defendants could possibly deprive them of any such rights. The tenth and eleventh amendments protect against certain exercises of *federal* power; they do not give individuals any rights against the exercise of *state* authority." Order at 9.

We are unpersuaded by the district court's logic. The district court seems to conclude that because a federal court injunction is being implemented and imposed by a state body—here the Baldwin County Commission—the activity being challenged necessarily becomes state activity and state activity alone. We

---

[4]The Tenth Amendment limits the power of the Federal Government and reserves powers to the states. *See New York v. United States,* 505 U.S. 144, 156-57, 112 S.Ct. 2408, 2418, 120 L.Ed.2d 120 (1992). The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Eleventh Amendment protects state sovereign immunity in federal courts. *See Idaho v. Coeur d'Alene Tribe of Idaho,* 521 U.S. 261, 267, 117 S.Ct. 2028, 2033, 138 L.Ed.2d 438 (1997). The Eleventh Amendment states: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.

disagree. What is being challenged here is the allegedly unconstitutional decision by a federal district court to alter the size of a local governing body. Activity performed pursuant to a federal court order is not transformed into the exclusive exercise of state power simply because it is performed by state actors who are obeying a federal court injunction. *See Printz v. United States,* 521 U.S. 898, 925-26, 117 S.Ct. 2365, 2379-80, 138 L.Ed.2d 914 (1997) (making clear that the Tenth Amendment prohibits "commandeering" state governments to administer federal regulatory programs); *Peel v. Florida Dep't of Transp.,* 600 F.2d 1070, 1081-85 (5th Cir.1979) (considering, but denying on summary judgement, a Tenth Amendment challenge to a federal court order requiring a state agency to reinstate a former employee pursuant to the Veterans' Reemployment Rights Act because, in that case, the exercise of Congress' war power outweighed the interference with the state's self determination). We cannot shield federal court orders from constitutional challenge simply because the federal court's orders are being implemented by local officials.

The Intervenors also argue that the district court erred in ruling that they did not have a basis for relief under Fed.R.Civ.P. 60. Rule 60(b) provides: "On a motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... 5) ... it is no longer equitable that the judgment should have prospective application.... This rule does not limit the power of a court to entertain an independent action to relieve a party from a judgment, order, or proceeding...." The district court ruled that the Intervenors could not seek relief under Rule 60 because "Rule 60 operates by motion only," and because Rule 60 does not define the substantive law as to the grounds for vacating judgments, but " 'merely prescribes the practice in proceedings to obtain relief.' " Order at 11 (quoting 1946 Advisory Comm. Notes, Fed.R.Civ.P. 60).

Instead of filing a Rule 60 motion, the Intervenors essentially filed an independent action (albeit under the original case number) bringing entirely new claims from those previously asserted by the Dillard Plaintiffs. The language of Rule 60 makes clear, however, that relief may be sought through an independent action as well as by a motion filed in the original action. *See* Rule 60(b) (providing that "[t]his rule does not

limit the power of a court to entertain an independent action to relieve a party from a[n] ... order").[5]

Moreover, while the district court is correct that Rule 60 does not itself provide a substantive cause of action, we have already found that the Intervenors have stated substantive causes of action challenging the 1988 injunction. We conclude, therefore, that Rule 60 does provide the Intervenors with a proper procedural tool to seek relief from the 1988 injunction.

## C.

Finally, the Intervenors ask that this Court itself order the modification of the 1988 injunction to provide for four single-member districts rather than seven, and to remand the case to the district court only to have it supervise the development of the appropriate districting plan. We decline this invitation, however, because there are issues remaining that are best addressed first by the district court. For example, the district court should consider whether the fact that the 1988 injunction was predicated on findings of intentional discrimination by the legislature has any impact on how *Holder, Nipper,* and *White* affect this case. While *Holder, Nipper,* and *White* make clear that changing the size of the Baldwin County Commission was an improper remedy for a section 2 violation, the cases do not address whether such a remedy might have been appropriate to remedy a violation of the Fourteenth Amendment. Indeed, in *Holder* the Supreme Court remanded the case to the court of appeals to consider the plaintiffs' Fourteenth Amendment claim. *See Holder,* 512 U.S. at 885, 114 S.Ct. at 2588.[6]

Accordingly, we will not reach out and summarily modify the 1988 injunction. Instead, we reverse the district court's order dismissing the Intervenors' complaint-in-intervention and remand the case to the district court for further proceedings consistent with this opinion.

---

[5]The Advisory Committee Notes to the 1946 Amendment to Rule 60 also make clear the option of seeking relief through an independent action. According to the Notes: "Two types of procedure to obtain relief from judgments are specified in the rules as it is proposed to amend them. One procedure is by motion in the court and in the action in which the judgment was rendered. The other procedure is by a new or independent action to obtain relief from a judgment, which action may or may not be begun in the court which rendered the judgment."

[6]This example is meant to illustrate not limit the scope of the district court's review.

REVERSED AND REMANDED.

BARKETT, Circuit Judge, concurring specially:

Based on the precedent of this Circuit, I concur in the majority's conclusion that this case be remanded for further proceedings. While I have reservations about whether *Atlanta Gas and Light Co. v. Dep't of Energy*, 666 F.2d 1359, 1368 n. 16 (11th Cir.) cert. denied, 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 78 (1982), and *Seniors Civil Liberties Ass'n v. Kemp*, 965 F.2d 1030, 1034 n. 6 (11th Cir.1992), were correct in saying that private plaintiffs have standing to assert Tenth Amendment claims, I agree that they foreclose Appellees arguments in this regard.[1]

Although it does not make a difference in the outcome of this proceeding, I think that the majority's additional finding that the Intervenors state a claim under Section 2 of the Voting Rights Act is erroneous. Having reviewed the Complaint in Intervention, I do not believe that it contains any of the requisite allegations for asserting a claim under the Voting Rights Act.[2] The Intervenors have not alleged that their right to vote has been denied or abridged on account of race or color. They do not allege that they personally suffer vote dilution because there are seven instead of four commissioners, or that the expanded commission size in any other way impairs their equal opportunity to participate fully in the political process and elect the candidate of their choice. The only allegation to which the majority opinion points is the Intervenors' assertion that "the district court intentionally increased the size of the Baldwin County Commission and redrew the district lines specifically in order to create a majority black district." Maj. op. at 3834-35. This allegation is not sufficient, in my view, to establish a claim under the Voting Rights Act.

---

[1]*But see Tennessee Elec. Power Co. v. T.V.A.,* 306 U.S. 118, 144, 59 S.Ct. 366, 83 L.Ed. 543 (1939) (observing in passing that "absent the states or their officers," private parties "have no standing ... to raise any question under the [Tenth] Amendment."); *see also Nance v. EPA,* 645 F.2d 701, 716 (9th Cir.1981) ("insofar as the Tenth Amendment is designed to protect the interest of states qua states," standing of private party "may be seriously questioned"); *Metrolina Family Practice Group, P.A. v. Sullivan,* 767 F.Supp. 1314, 1320 (W.D.N.C.1989), aff'd, 929 F.2d 693 (4th Cir.1991).

[2]Section 2 of the Voting Rights Act provides: "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color...." 42 U.S.C. § 1973(a).