[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
**July 13, 2004**
THOMAS  K. KAHN
CLERK

No. 03-14668

D. C. Docket No. 87-01159 CV-T-N

JOHN DILLARD,

Plaintiff-Cross-Claimant-Appellant,

DAMASCUS CRITTENDEN, JR.
EARWEN FERRELL,
CLARENCE J. JARRELLS,
ULLYSSES MCBRIDE,
LOUIS HALL, JR.,

Plaintiffs-Appellants,

BILLY R. SMITH
JOE E. HORACE,
WILLIE E. EDWARDS,

Intervenor-Plaintiffs-Cross-
Claimants-Appellants,

DALE EUGENE BROWN,
GEORGE R. JOHNSON,
JAMES AUSTIN,
ALVIN LEE PITTS,

Intervenor-Plaintiffs,
Cross Defendants-Appellees.

versus

BALDWIN COUNTY COMMISSIONERS,

Defendants-Appellees,

ADRIAN JOHNS,

Intervenor-Defendant,
Appellee.

_____

No. 03-16061

_____

D. C. Docket No. 87-01159 CV-T-N

JOHN DILLARD,

Plaintiff-Cross-Claimant-Appellant,

DAMASCUS CRITTENDEN, JR.,
EARWEN FERRELL,
CLARENCE J. JARRELLS,
ULLYSSES MCBRIDE,
LOUIS HALL, JR.,

Plaintiffs-Appellants,

BILLY R. SMITH,
JOE E. HORACE,
WILLIE E. EDWARDS,

Intervenor-Plaintiffs-

2

DALE EUGENE BROWN,
GEORGE R. JOHNSON,
JAMES AUSTIN, JR.,
ALVIN LEE PITTS,

Intervenor-Plaintiffs,
Cross-Defendants-Appellees.

versus

BALDWIN COUNTY COMMISSIONERS,

Defendant-Appellee,

ADRIAN JOHNS,

Intervenor-Defendant,
Appellee.

————

Appeals from the United States District Court
for the Middle District of Alabama

————

**(July 13, 2004)**

Before DUBINA and CARNES, Circuit Judges, and MILLS\*, District Judge.

---

\*Honorable Richard Mills, United States District Judge for the Central District of Illinois, sitting by designation.

3

DUBINA, Circuit Judge:

In this appeal, we are confronted with the question of whether a federal court must award relief on a vote dilution claim brought under section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, where the circumstances of the case make clear that no form of relief available under section 2 will empower the protected minority group with any meaningful opportunity to elect the candidate of its choice. We answer the question in the negative and therefore affirm the district court's order dissolving a permanent injunction that the district court had imposed on Appellee Baldwin County Commission (the "Commission") in 1988, after concluding, nearly fifteen years later, that further section 2 relief was unavailable.

## I.  FACTS AND PROCEDURAL HISTORY

The epic history of this case began nearly twenty years ago, as an outgrowth of earlier proceedings in another case initiated by Plaintiff-Appellant John Dillard and other African-American citizens of Alabama (collectively "Dillard")[1] in order to challenge the at-large, numbered-post election schemes[2] employed by nine

---

[1]Dillard was later joined in this action by Plaintiffs-Intervenors-Appellants Billy R. Smith, Joe M. Horace, and Willie E. Edwards. Their interests are identical to Dillard's in this litigation.

[2]In a county employing an at-large, numbered-post election scheme, each candidate for an elected office runs county-wide for a particular designated seat, referred to as the

Alabama counties under section 2 of the Voting Rights Act and the Fourteenth and Fifteenth Amendments to the United States Constitution. *See Dillard v. Crenshaw County*, 640 F. Supp. 1347 (M.D. Ala. 1986). The district court found in that case that these election schemes were the product of, or tainted by, racially inspired enactments of the Alabama legislature, *id.* at 1357-60, and subsequently allowed Dillard to expand his complaint to include 183 cities, counties, and county school boards that were using similar voting systems.

The Commission was among the entities added to *Dillard v. Crenshaw County* after the district court made its initial findings. At that time, the Commission was composed of four commissioners that were elected under a system that included the challenged structural features. *See Dillard v. Baldwin County Comm'n*, 694 F. Supp. 836, 837 (M.D. Ala. 1988) ("*Dillard I*"). Rather than litigate the entire dispute, the Commission entered into a consent decree with Dillard in which it agreed "not [to] contest the plaintiffs' claims that its present at-large election system violates the Voting Rights Act." However, the Commission vigorously contested the issue of what would constitute an appropriate remedy for this conceded violation. *Id.*

---

"numbered post."

In proceedings conducted in the district court, the Commission offered to increase the size of the Commission from four to five and to abandon the challenged numbered-post feature of its existing voting system. *Id.* at 838. In theory, the resulting "pure" at-large voting system would have improved minority voting strength by allowing candidates that were less popular with the white majority to win elections with a plurality of votes cast.

Dillard argued that the Commission's proposed remedy itself violated the Voting Rights Act, and urged the district court to carve Baldwin County into seven single-member districts, gerrymandered to create a district with an African-American majority. *Id.* According to Dillard, increasing the Commission to seven members was imperative because of the small and declining size of the African-American population in Baldwin County, which was projected to fall below 14% of the county's total population by 1990. *Id.* at 839-40. The district court agreed with Dillard and entered a permanent injunction adopting Dillard's proposal. *Id.* at 844-45.[3] The redistricting of the county created a district with an African-American population that was expected to be over 63% in 1990. *Id.* at 843.

---

[3]This court affirmed without opinion. *Dillard v. Baldwin County Comm'n*, 862 F.2d 878 (11th Cir. 1988) (Table) ("*Dillard II*").

Six years after the district court entered its injunction, a plurality of the Supreme Court decided in *Holder v. Hall*, 512 U.S. 874, 114 S. Ct. 2581, 129 L. Ed. 2d 687 (1994), that a federal court cannot modify the size of an elected governing body in order to remedy a section 2 violation because "[t]here is no principled reason why one size should be picked over another as the benchmark for [determining whether vote dilution has occurred]." *Id.* at 881, 114 S. Ct. at 2586. Subsequently, this court held in *Nipper v. Smith*, 39 F.3d 1494 (11th Cir. 1994) (en banc), that "under *Holder*, federal courts may not mandate as a section 2 remedy that a state or political subdivision alter the size of its elected bodies." *Id.* at 1532; *see also White v. Alabama*, 74 F.3d 1058, 1072 (11th Cir. 1996) (holding, under *Holder* and *Nipper*, that the federal courts lacked the authority under section 2 to require the State of Alabama to increase the size of its appellate courts).

In light of these decisions, Dale Brown and other residents of Baldwin County (collectively "Brown") moved to intervene in the case in October 1996, seeking vacatur of the injunction on grounds that it exceeded the district court's powers under the Voting Rights Act, and that it violated the Tenth and Eleventh Amendments. The district court allowed Brown to intervene post-judgment but then dismissed his complaint on grounds that he failed to state a claim on which relief could be granted. *Dillard v. Baldwin County Comm'n*, 53 F. Supp. 2d 1266,

1268, 1273 (M.D. Ala. 1999) ("*Dillard III*"). On appeal from that decision, we reversed, holding that Brown had stated a claim for relief cognizable both under section 2 of the Voting Rights Act and under 42 U.S.C. § 1983 for violations of the Tenth and Eleventh Amendments. *Dillard v. Baldwin County Comm'rs*, 225 F.3d 1271, 1280-82 (11th Cir. 2000) ("*Dillard IV*"). We remanded the case to the district court to consider *inter alia* whether the 1988 injunction may have been an appropriate remedy under the Fourteenth Amendment, even though it had been improper under section 2 of the Voting Rights Act. *Id.* at 1282-83.

On remand, the district court conducted a bench trial, during which the evidence showed that the 1988 injunction had not increased African-American voting power in Baldwin County as intended because the proportion of African-American voters in the county had continued to decline. As of the 2000 census, the county's voting-age African-American population had declined to 9.13%, and Baldwin County no longer had a majority-minority district. Faced with this reality, Dillard now asked the district court to abandon the single-member district scheme that he had demanded fifteen years earlier, and argued instead for the court to compel the Commission to adopt a cumulative voting system,[4] or in the

---

[4]Under a cumulative voting system, each voter has as many votes as there are posts to be filled and may either divide his votes between candidates or concentrate his votes on a single candidate. *See Holder*, 512 U.S. at 910 n.15, 114 S. Ct. 2601, n.15 (Thomas, J., concurring).

alternative, to order the Commission to adopt a "pure" at-large system, the remedy Dillard complained was inadequate fifteen years earlier, when Baldwin County's African-American population represented a substantially larger proportion of the county's total population. In either case, Dillard argued that the district court had "no basis" for reducing the Commission to its pre-injunction size, in spite of the Supreme Court's decision in *Holder*, and this court's en banc holding in *Nipper*. Dillard stressed that, although the injunction could be modified, it could not be modified against the interest of the minority class if the injunction had been a legitimate remedy in 1988, as voting rights law was understood at that time, even though subsequent mandatory authority has made clear that it could never be a legitimate remedy for any future section 2 plaintiff.

The district court rejected Dillard's arguments and concluded that it lacked any basis for retaining supervision of the Commission's election system. *Dillard v. Baldwin County Comm'n*, 222 F. Supp. 2d 1283, 1287 (M.D. Ala. 2002) ("*Dillard V*"). After Dillard moved to amend the district court's judgment, the court explained that it could no longer find a section 2 violation because "[t]he political weakness of the African-American community in Baldwin County [now]

---

"The system thus allows a numerical minority to concentrate its voting power behind a given candidate without requiring that the minority voters themselves be concentrated into a single district." *Id.*

results from its being less than 10% of the voting age population and the fact that it does not live in a geographically compact community." *Dillard v. Baldwin County Comm'n*, 282 F. Supp. 2d 1302, 1303 (M.D. Ala. 2003) ("*Dillard VI*"). The court further concluded that the cumulative voting system that Dillard now sought was not an appropriate section 2 "results" remedy because "there is no objective and workable standard for choosing [it as a] reasonable benchmark[] over the many forms of government." *Id.* (internal quotations omitted). This appeal followed.

## II. ISSUE

Whether the district court abused its discretion by dissolving its injunction on the ground that the African-American population of Baldwin County is not numerically large enough to obtain relief on a vote dilution claim under section 2 of the Voting Rights Act.

## III. STANDARD OF REVIEW

We review a district court's decision to modify an injunction for abuse of discretion, and it is an abuse of discretion for the district court to fail to make modifications required by applicable law. *Wilson v. Minor*, 220 F.3d 1297, 1301 (11th Cir. 2000). However, we review the district court's factual findings underpinning its decision for clear error, and we review its analysis of applicable

law *de novo*. *See Davis v. Chiles*, 139 F.3d 1414, 1420 (11th Cir. 1998). In the section 2 context, we afford the district court's findings with special deference "due to [the court's] special vantage point and ability to conduct an intensely local appraisal of the design and impact of a voting system." *Negron v. City of Miami Beach, Fla.*, 113 F.3d 1563, 1566 (11th Cir. 1997) (internal quotations omitted).

## IV. DISCUSSION

Section 2 of the Voting Rights Act prohibits states and their political subdivisions from imposing or applying a voting structure or practice "in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color." 42 U.S.C. § 1973(a). In addition, section 2 provides a cause of action for protected minority groups that can establish, based on the totality of circumstances, "that [their] members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). Numerically small minority groups have latched onto this broadly-worded "participation" provision as support for the theory that section 2 provides a dilution of minority "influence" cause of action for any protected group that can demonstrate that its members have "less opportunity" than the electorate at large "to participate in the political process." However, the Supreme Court made clear in *Thornburg v. Gingles*, 478 U.S. 30, 106 S. Ct. 2752,

11

92 L. Ed. 2d 25 (1986), that "[u]nless minority voters possess *the potential to elect representatives* in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Id.* at 51 n.17, 106 S. Ct. at 2767 n.17 (emphasis added). This precondition to recovery precludes minority groups from pursuing vote dilution claims unless they can meet some threshold level of numerical substantiality. *See Gingles v. Edmisten*, 590 F. Supp. 345, 381 (E.D.N.C. 1984) (three-judge panel) ("We are doubtful that either the Supreme Court in developing the dilution concept in constitutional voting rights litigation, or the Congress in embodying it in amended Section 2 of the Voting Rights Act intended an application open-ended as to voter group size. There must obviously be some size (as well as dispersion) limits on those aggregations of voters to whom the concept can be applied."), *aff'd in part, rev'd in part sub nom.*, *Gingles*, 478 U.S. at 50 n.17, 106 S. Ct. at 2766 n.17 (holding that a "minority group [that] is so small in relation to the surrounding white population that it could not constitute a majority in a single-member district, . . . cannot maintain that [it] would have been able to elect representatives of [its] choice in the absence of the multimember electoral structure"); *see also McGhee v. Granville County*, 860 F.2d 110, 119 (4th Cir. 1988) (commenting that *Gingles* precludes small and unconcentrated minority groups from bringing vote dilution claims).

12

In *Gingles*, the Supreme Court held that plaintiffs claiming vote dilution through the use of multimember districts must prove, as preconditions to relief, (1) that the minority group challenging the existing election scheme "is sufficiently large and geographically compact;" (2) that the minority group is "politically cohesive;" and (3) that "the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 50-51, 106 S. Ct. at 2766-67. Pursuant to the first *Gingles* precondition, which has particular relevance in this case, the protected group must demonstrate that it is "sufficiently large and geographically compact" to elect the candidate of its choice in the absence of the challenged structure or practice.[5] We agree with the district

---

[5]In *Gingles*, the Supreme Court articulated this precondition as whether the protected group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50, 106 S. Ct. at 2766 (emphasis added). However, the Court subsequently acknowledged in *Voinovich v. Quilter*, 507 U.S. 146, 113 S. Ct. 1149, 122 L. Ed. 2d 500 (1993), that this factor "cannot be applied mechanically and without regard to the nature of the claim," *id.* at 158, 113 S. Ct. at 1157, *quoted in Nipper*, 39 F.3d at 1531, and specifically recognized that it could be modified when analyzing an influence dilution claim "[where the plaintiffs allege] the possibility of being a sufficiently large *minority* to elect their candidate of choice with the assistance of cross-over votes from the white majority," *id.* The Supreme Court's commentary in *Voinovich* suggests that the first *Gingles* precondition need not rigidly preclude a minority group that cannot constitute "a majority in a single-member district" from obtaining section 2 relief where the group is not seeking the creation of a single-member district. Regardless, nothing in *Voinovich* limits the further requirement in *Gingles* that minority voters prove that they possess the potential to *elect* representatives of their choice in the absence of a challenged structure or practice before they can claim to be injured by it. *Gingles*, 478 U.S. at 51 n.17, 106 S. Ct. at 2767 n.17; *see also Negron*, 113 F.3d at 1569 ("[T]he foundational inquiry for the first *Gingles* precondition is whether the minority has the potential *to elect* a representative of its own choice.") (internal quotations omitted).

13

court's finding that the minority group that Dillard represents, comprising less than 10% of the relevant electorate, cannot possibly satisfy this precondition to relief under the circumstances presented in this case. *See Dillard VI*, 282 F. Supp. 2d at 1302.

Dillard argues that the district court erred in applying the first *Gingles* precondition because of the Commission's agreement in 1987 "not [to] contest the plaintiffs' claims that its present at-large election system violates the Voting Rights Act." We conclude, however, that Dillard has overstated the prospective impact of this ambiguous concession, in light of the interplay between "[t]he inquiries into remedy and liability" in the section 2 context. *Nipper*, 39 F.3d at 1530. We held in *Nipper* that "[t]he first *Gingles* precondition, informed by the second, dictates that the issue of remedy is part of the plaintiff's prima facie case in section 2 vote dilution cases." *Id.*; *see Davis*, 139 F.3d at 1419 ("As part of any prima facie case under Section Two, a plaintiff must demonstrate the existence of a proper remedy."). We further held that "[t]he absence of an available remedy is not only relevant at the remedial stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability." *Nipper*, 39 F.3d at 1533; *see also Growe v. Emison*, 507 U.S. 25, 40-41, 113 S. Ct. 1075, 1084, 122

L. Ed. 2d 388 (1993) ("Unless [the *Gingles* preconditions] are established, there neither has been a wrong nor can be a remedy.").

In entering into the consent decree, the Commission may have conceded that a section 2 violation existed, and that an appropriate remedy could be crafted, as voting rights law was then understood. However, any remedy that could have been conceded as appropriate in 1987 was subsequently rendered inappropriate by *Holder* and *Nipper*. In light of the interplay between the inquiries into remedy and liability that we recognized in *Nipper*, the district court was thus precluded from finding an ongoing section 2 violation in this case. As such, the Commission's prior agreement not to contest the substantive liability issues in Dillard's section 2 claim can have no bearing on how the *Gingles* preconditions apply in this case, or, more generally, whether Dillard has met his burden of establishing the existence of an appropriate remedy.[6] Because the *Gingles* preconditions are necessary

---

[6]We also reject Dillard's argument that the Commissioner's prior agreement not to contest the substantive issues in his section 2 claim somehow obligated the district court to award or perpetuate relief that would otherwise be unavailable. Only the federal courts can decide whether a particular modification of a municipality's voting system is an "appropriate remedy" for a section 2 violation, and the parties cannot compel the federal courts to enforce a remedy that is not appropriate. Dillard's reliance on *Frew v. Hawkins*, ___ U.S. ___, 124 S. Ct. 899, 157 L. Ed.2d 855 (2004), in support of this argument is misplaced. The issue in *Frew* was whether a federal court had the authority to enforce the terms of a consent decree against state officials, without violating their Eleventh Amendment immunity, to the extent those obligations exceeded the state's duties imposed by federal Medicaid law. *Id.* at 904-05. The consent decree at issue was "a detailed document about 80 pages long that order[ed] a comprehensive plan for implementing [the state's Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") program required by] federal statute." *Id.* at 902. The Court noted that the decree "reflect[ed] a

15

prerequisites to all section 2 vote dilution claims, they must also be necessary prerequisites to all demands that a district court perpetuate relief imposed under the aegis of section 2.

Dillard urges us to conclude that numerically small minority groups can bring claims under section 2, so long as the group can point to a structure or practice that theoretically impairs its ability to *influence* electoral outcomes. His claim of "influence dilution" is distinguished only by the remedy he seeks from the claims of minority groups seeking the creation of "influence" districts, i.e. districts "where minority voters may not be able to elect a candidate of choice but can play a substantial, although not decisive, role in the electoral process."

---

choice among ways that a State could implement the Medicaid Act," and that "enforcing the decree vindicate[d] an agreement that the state officials reached to comply with federal law." *Id.* at 905. Accordingly, the Court concluded that enforcement of the decree was appropriate, even to the extent it imposed obligations beyond those required by the relevant federal law.

In this case, Dillard seeks to enforce a single, ambiguous statement, in which the Commission agreed "not [to] contest the plaintiffs' claims that its present at-large election system violated the Voting Rights Act." This statement, even read in context with *Frew*, cannot possibly impose an affirmative duty on the district court to award or perpetuate relief in this case. At most, *Frew* stands for the limited proposition that the district court would have no Eleventh Amendment obstacle to enforcing a Voting Rights Act consent decree against the Commission, even to the extent that the Commission's obligations in the decree exceeded, but were not inconsistent with, those imposed by the Voting Rights Act and other applicable federal law. *Frew* provides no support for Dillard's position that a private litigant can force the hand of a district court in order to obtain relief against a state in a manner that would otherwise exceed the court's remedial authority. In fact, we have expressly held to the contrary, that a district court has no authority to impose a remedy through a consent decree that is not authorized by the Voting Rights Act. *White*, 74 F.3d at 1074-75.

16

*Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 376 (S.D.N.Y. 2004) (three-judge panel). This "influence dilution" concept, although apparently a question of first impression in this circuit, has been consistently rejected by other federal courts. *See, e.g.*, *Cousin v. Sundquist*, 145 F.3d 818, 828 (6th Cir. 1998) (holding that a claim of "an impairment of the minority's ability to *influence* the outcome of the election, rather than to *determine* it" was not cognizable under the Voting Rights Act); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 947 (7th Cir. 1988) ("[W]e cannot consider claims that . . . districts merely impair plaintiffs' ability to influence elections. Plaintiffs' ability to win elections must also be impaired."); *Rodriguez*, 308 F. Supp. 2d at 378; *Illinois Legislative Redistricting Comm'n v. LaPaille*, 786 F. Supp. 704, 715-17 (N.D. Ill. 1992) (three-judge panel); *Turner v. Arkansas*, 784 F. Supp. 553, 568-72 (E.D. Ark. 1991) (three-judge panel), *aff'd*, 504 U.S. 952, 112 S. Ct. 2296, 119 L. Ed. 2d 220 (1992); *Hastert v. State Bd. of Elec.*, 777 F. Supp. 634, 652-54 (N.D. Ill. 1991) (three-judge panel). The clear message of these cases, consistent with *Gingles*, is that a minority group cannot be awarded relief on a vote dilution claim unless it can demonstrate that a challenged structure or practice impedes its ability to determine the outcome of elections.

Dillard suggests that this substantial body of adverse authority is inapposite and is evidence only of the general reluctance of federal courts to affirmatively

create single-member districts or to compel redistricting. According to Dillard, the result should be different here, where the remedy sought is "less intrusive." We disagree.

As an initial matter, we question whether the "cumulative voting" system that Dillard seeks to impose on the Commission is truly less "intrusive" than compelled redistricting. Implicit in the first *Gingles* requirement "is a limitation on the ability of a federal court to abolish a particular form of government and to use its imagination to fashion a new system." *Nipper*, 39 F.3d at 1531. Because "[n]othing in the Voting Rights Act suggests an intent on the part of Congress to permit the federal judiciary to force on the states a new model of government," *id.*, any remedy for a Voting Rights Act violation must come from within "the confines of the state's system of government," *id.* at 1533. After reviewing the record, we agree with the district court's finding that cumulative voting schemes simply do not occupy "a traditional and accepted place in Alabama's legislatively enacted voting schemes." *Dillard V*, 222 F. Supp. 2d at 1291. The federal courts have no authority to conjure up such an election scheme and impose it on a state government, regardless of the theoretical prospect of increasing minority voting strength.

In addition, we can find no evidence that the federal courts that confronted the influence dilution concept in the past were specially concerned with the intrusiveness of the remedy sought by particular section 2 plaintiffs. Instead, these courts uniformly expressed the desire to maintain ascertainable and objective standards from which to adjudicate section 2 claims. *See, e.g.*, *McNeil*, 851 F.2d at 942 (explaining that "[t]he creation of preconditions [is] a choice of clear rules over muddy efforts to discern equity [that] shields the courts from meritless claims and ensures that clearly meritorious claims will survive summary judgment"); *Hastert*, 777 F. Supp. at 653 (noting that, absent the *Gingles* preconditions, "relief becomes a truly perplexing issue necessarily requiring a court to resort to vague, subjective criteria"). The first *Gingles* precondition provides a gate-keeping mechanism by which the courts maintain these standards. Thus, an unrestricted breach of this precondition "w[ould] likely open a Pandora's box of marginal Voting Rights Act claims by minority groups of all sizes." *Hastert*, 777 F. Supp. at 654.

> [U]nbounded, [the vote dilution concept] could be applied to find
> 'dilution' of a minority group's voting power in any situation where
> the group had been unable, despite effort, to achieve representation

by the election of candidates of its choice in proportion to its

percentage of the total voting age constituency.

*McGhee*, 860 F.2d at 116; *see also* 42 U.S.C. § 1973(b) ("[N]othing in this section

establishes a right to have members of a protected class elected in numbers equal

to their proportion in the population."). We decline to open this Pandora's box.

As of the last census, the African-American population of Baldwin County

had declined to less than 10% of the county's total voting-age population. "If 10%

of the voters can 'swing' an election, perhaps so can 1% or 0.1%. A single voter

is the logical limit." *Illinois Legislative Redistricting Comm'n*, 786 F. Supp. at

716; *see also Hastert*, 777 F. Supp. at 654 (noting that, in the absence of the first

*Gingles* factor, "there appears to be no logical or objective measure for

establishing a threshold minority group size necessary for bringing an influence

claim under § 2"). We cannot conceive of any method by which we could award

Dillard relief in this case without awarding similar relief to even smaller minority

groups in future cases. To open the door to the inevitable flood of marginal

section 2 claims would impose an unwarranted burden on the lower federal courts

and an indefensible encroachment into the affairs of state governments. We

choose instead to follow the near universal view of other federal courts that a

minority group cannot obtain relief under section 2 without first showing that it is

20

"large enough to *control* a district, not just 'influence' it."[7] *Illinois Legislative Redistricting Comm'n*, 786 F. Supp. at 715 (emphasis added). Accordingly, because Dillard cannot establish that the African-American population in Baldwin County is large enough to control the outcome of elections, the district court did not err in concluding that "[t]he political weakness of the African-American community in Baldwin County results from its being less than 10% of the voting age population and the fact that it does not live in a geographically compact community." *Dillard VI*, 282 F. Supp. 2d at 1303.

## V. CONCLUSION

We hold that a protected minority group pursuing a vote dilution claim under section 2 of the Voting Rights Act has no right to relief unless it can demonstrate that, in the absence of the challenged voting structure or practice, its

---

[7]We leave open the question of whether a section 2 plaintiff can pursue a "coalition" or "crossover" dilution claim, i.e. a claim where "members of the minority group are not a majority of the relevant voting population but nonetheless have the ability to *elect* representatives of their choice with support from a limited but reliable white crossover vote." *Rodriguez*, 308 F. Supp. 2d at 376 (emphasis added). Although some courts have strictly adhered to the *Gingles* majority-minority requirement when confronted with such claims, *see, e.g.*, *Valdespino v. Alamo Heights Indep. Sch. Dist.*, 168 F.3d 848, 851-53 (5th Cir.1999) (rejecting an ability-to-elect claim on the ground that the *Gingles* "bright line test" requires proof that members of a minority group "constitute more than 50% of the relevant population in their demonstration district"), this issue presents a closer question because of the Supreme Court's commentary in *Voinovich* that the *Gingles* test could be modified if a court is confronted with the claim of a "minority [population sufficiently large] to elect [its] candidate of choice with the assistance of cross-over votes from the white majority." *Voinovich*, 507 U.S. at 158, 113 S. Ct. at 1157. The African-American population of Baldwin County is too small for this concept to have any application in this case, and so we have no opportunity to address its merits.

members would have the ability to elect the candidate of its choice. If the group is too small to elect candidates of its choice in the absence of a challenged structure or practice, then it is the size of the minority population that results in the plaintiff's injury, and not the challenged structure or practice. Accordingly, we conclude that the district court did not abuse its discretion in declining to grant additional relief in this case, because it correctly found that no further relief was available.

**AFFIRMED.**